IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

JOSE A. RIVERA RAMOS,

     Plaintiff,

     v.

MICHAEL J. ASTRUE, Commissioner of
the Social Security Administration,

     Defendant.

Civil No. 10-1220 (JAG/BJM)

## REPORT AND RECOMMENDATION

     Plaintiff José A. Rivera Ramos ("Rivera") filed a complaint seeking judicial review of the decision of the defendant, Michael J. Astrue, Commissioner of the Social Security Administration ("Commissioner"), that he was not disabled under Sections 216(i) and 223 of the Social Security Act, 42 U.S.C. §§ 416(i) and 423. (Docket No. 2). Rivera's supporting memorandum of law asks for judgment reversing the determination of the Commissioner and ordering an award of disability benefits. (Docket No. 10). The Commissioner answered the complaint but failed to file a supporting memorandum of law despite the court's grant of an extension of time in which to do so. (Docket Nos. 8, 11, 12). The presiding district judge referred the matter to me for a report and recommendation. (Docket Nos. 13, 14). After careful review of the administrative record and claimant's brief, I recommend that the Commissioner's decision be **vacated**.

## LEGAL STANDARD

     The court's review is limited to determining whether the Administrative Law Judge ("ALJ") employed the proper legal standards and found facts upon the proper quantum of evidence. Manso-Pizarro v. Sec'y of Health & Human Servs., 76 F.3d 15, 16 (1st Cir. 1996). The ALJ's findings of fact are conclusive when supported by substantial evidence, 42 U.S.C. § 405(g), but are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts. Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999); Ortiz v. Sec'y of Health & Human

Servs., 955 F.2d 765, 769 (1st Cir. 1991);  Da Rosa v. Sec'y of Health & Human Servs., 803 F.2d 24, 26 (1st Cir. 1986).  The court "must affirm the [Commissioner's] resolution, even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence." Rodríguez Pagán v. Sec'y of Health & Human Servs., 819 F.2d 1, 3 (1st Cir. 1987).  Written reports submitted by non-examining physicians who merely reviewed the written medical evidence are not substantial evidence, although these may serve as supplementary evidence for the ALJ to consider in conjunction with the examining physician's reports.  Irizarry-Sanchez v. Comm'r of Soc. Sec., 253 F. Supp. 2d 216, 219 (D.P.R. 2003).  The burden is on the claimant to prove that she is disabled within the meaning of the Social Security Act ("Act").  See Bowen v. Yuckert, 482 U.S. 137, 146-47, n.5 (1987).  A claimant is disabled under the Act if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  Under the statute, a claimant is unable to engage in any substantial gainful activity when she "is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."[1]  42 U.S.C. § 423(d)(2)(A).  In determining whether a claimant is disabled, all of the evidence in the record must be considered.  20 C.F.R. § 404.1520(a)(3).

A five-step sequential evaluation process must be applied to every case in making a final determination as to whether a claimant is disabled.  20 C.F.R. § 404.1520; see also Bowen, 482 U.S. at 140-42; Goodermote v. Sec'y of Health & Human Servs., 690 F.2d 5, 6-7 (1st Cir. 1982).  In step one, the ALJ determines whether the claimant is engaged in "substantial gainful activity."  If she is, disability benefits are denied.  20 C.F.R. § 404.1520(b).  If she is not, the ALJ proceeds to step two,

---

[1] The phrase "work which exists in the national economy" means "work which exists in significant numbers either in the region where such individual lives or in several regions of the country."  42 U.S.C. §423(d)(2)(A).

through which it is determined whether the claimant has a medically severe impairment or combination of impairments.  20 C.F.R. § 404.1520(c).  If the claimant does not have a severe impairment or combination of impairments, the disability claim is denied.  However, if the impairment or combination of impairments is severe, the evaluation proceeds to the third step, in which it is determined whether the claimant has an impairment equivalent to a specific list of impairments contained in the regulations' Appendix 1, which the Commissioner acknowledges are so severe as to preclude substantial gainful activity.  20 C.F.R. § 404.1520(d); 20 C.F.R. pt. 404, subpt. P, App. 1.  If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be disabled.  If the impairment is not one that is conclusively presumed to be disabling, the evaluation proceeds to the fourth step, through which the ALJ determines whether the impairment prevents the claimant from performing the work she has performed in the past.  If the claimant is able to perform her previous work, she is not disabled.  20 C.F.R. § 404.1520(e).  If it is determined that the claimant cannot perform this work, then the fifth and final step of the process calls for a determination of whether the claimant is able to perform other work in the national economy in view of the residual functional capacity, as well as age, education, and work experience.  If the claimant cannot, then she is entitled to disability benefits.  20 C.F.R. § 404.1520(f).

The claimant has the burden, under steps one through four, of proving that she cannot return to her former employment because of the alleged disability.  Santiago v. Sec'y of Health & Human Servs., 944 F.2d 1, 5 (1st Cir. 1991).  Once a claimant has demonstrated a severe impairment that prohibits return to her previous employment, the Commissioner has the burden, under step five, to prove the existence of other jobs in the national economy that the claimant can perform.  Ortiz v. Sec'y of Health & Human Servs., 890 F.2d 520, 524 (1st Cir. 1989).

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Rivera was born on March 11, 1976, has a high school education, and previously worked as

an assembly line worker in a factory.  (Transcript ["Tr."] 19, 516).[2]  He claims a disability onset date

of June 28, 2004, at age 28, due to a back condition, back pain, and depression, and was last insured

for Social Security disability benefits on December 30, 2009.  (Tr. 13, 15, 38, 123-28).

## I.      Physical Medical Treatment History

Prior to the alleged onset date, claimant was diagnosed in January 2004 with left shoulder

sprain, whose pain was relieved with Celebrex.  In April 2004, after spraining his left ankle tripping

on some cables at work, claimant was instructed to use an ankle brace since medication did not

relieve the ankle discomfort and to continue using Celebrex for shoulder pain management.  (Tr.

191-93, 488-93).  On June 14, 2004, claimant reported low back pain of three days' duration, but did

not recall any precipitating event.  He had back and torso stiffness when walking and sitting, upper

lumbar tenderness to palpation, and a positive straight leg raising test in the left leg.  He was

prescribed a muscle relaxant, ice, and rest.  A lumbosacral spine x-ray taken two days later showed

anterior vertebral bone spurs throughout the spine, straightening of the normal lordotic curvature,

significant narrowing of the L1-L2 disc space, and mild narrowing of the other disc spaces,

compatible with spasm, spondyloarthritis, and possibly post-traumatic changes with discogenic

disease.  On June 21, 2004, claimant reported relief with treatment, and his left ankle, though tender,

had full range of motion and no edema.  (Tr. 189-90, 277, 367, 469, 486-87, 496).

On June 28, 2004, the alleged disability onset date, claimant reported continued low back

pain that radiated to the buttocks, increased when standing up from sitting, and caused a waist-level

pinching sensation when walking.  He had a positive straight leg raising test on the left side.  (Tr.

188, 485).  The following day, claimant was treated through the State Insurance Fund ("SIF") for

shoulder, lumbar, and left ankle pain.  He walked with difficulty and stated that his back pain

---

[2] At numerous points in the transcript, due to apparent translator error, the translations do not
correspond to the originals or a translation appears unaccompanied by the original document.  (E.g., Tr.
136-37, 139-40, 163-65, 203-04, 239-40, 247-48, 343, 388-407).  There are also inconsistent translations
by the same translator of the same document.  (Tr. 194-95, 494-95).

worsened upon heavy exertion.  X-rays of the lumbosacral spine were consistent with the x-rays from earlier that month; shoulder and left ankle x-rays showed nothing unusual.  Claimant was diagnosed with lumbosacral strain, bilateral shoulder strain, and left ankle strain, and prescribed Celebrex and Robaxin.  (Tr. 132-44, 170-71, 273, 464).  After a similar diagnosis in July 2004, claimant began physical therapy in August 2004.  An electromyogram on August 11, 2004 indicated diffuse axonal motor neuropathy affecting the lower extremities, and a lumbar spine CT scan two days later showed degenerative disc disease, herniated lumbar discs at L5-S1 and L4-L5, and severe loss of lordosis suggestive of muscle spasm.  (Tr. 271-76, 283-84, 362-66, 462-65, 468, 479-80).

In September 2004, after initially being able to squat and reporting stable foot pain and relief of back pain, claimant reported later in the month that the lumbosacral pain did not improve, varied in frequency and intensity, and "seems to be for life," and in late September he received intramuscular injections of Toradol, Kenalog, and Norflex for severe lumbar pain going down to his ankle.  (Tr. 261-64, 285-86, 292-93, 353-55, 481-82).  On October 14, 2004, he stated that he had noticed low back pain when lifting a heavy object on June 10 of that year.  He reported numbness and pain in both legs, which caused nocturnal cramps, worsened when sitting, and was relieved with bed rest.  A lumbosacral spine CT scan showed irregularities at the L1-L2 vertebrae and an electromyogram showed bilateral axonal neuropathy.  He was recommended for a pain clinic evaluation but ruled a non-surgical case.  (Tr. 187, 477-78).

In November 2004, claimant had trouble sitting and getting up due to lumbosacral pain radiating to his legs and was referred to a chiropractor.  He was diagnosed with nonallopathic lesions in the lumbar region.  (Tr. 289-90, 344-45).  After receiving one adjustment, claimant refused to continue because it hurt too much and was referred for acupuncture instead.  (Tr. 267-68, 287-88, 358-59, 460-61, 483-84).  Acupuncture therapy from November 23, 2004 through February 25, 2005 yielded good final results as of the end of treatment, although on February 7, 2005 claimant reported intense back pain radiating to the shoulders despite the acupuncture.  (Tr. 172-73, 257-60, 348-51,

466-67).  After claimant experienced very intense leg pain, slow gait, and limitation of external flexion at the end of March 2005, magnetic resonance imaging of the lumbar spine on April 8, 2005 showed straightening of the lumbar lordosis due to paravertebral muscular spasm, a Schmorl's node at L1, and evidence of disc protrusion at L5-S1 and L4-L5.  (Tr. 255-56, 291, 346-47, 387).

On June 13, 2005, claimant received a neurological evaluation by Dr. Marisol Mubarak de Martin.  He was able to climb onto the examining table, had a slow, normal gait, and had negative bilateral Lasegue, straight leg raising, Phalen, and Tinel's tests.  Dr. Mubarak diagnosed muscle spasm and recommended avoiding lifting weight or "high impact."  X-rays taken three days later showed lumbar vertebrae bone spurs, lordotic straightening suggesting paravertebral muscle spasm, and evidence of a Schmorl's node at L1 and of degenerative changes. (Tr. 329-39).  In July 2005, claimant had decreased range of motion in the back and complained of severe lumbosacral pain that radiated to the left leg, restricted his movements, and caused sleep difficulty.  (Tr. 249-52, 379-80).

A non-treating physician completed a physical residual functional capacity ("RFC") assessment of Rivera's medical record for the SSA on July 15, 2005, which was affirmed and adopted on December 6, 2005 and reaffirmed on May 6, 2006.  (Tr. 213, 295, 320-28).  The assessment concluded that Rivera could occasionally lift and/or carry 50 pounds, frequently lift and/or carry 25 pounds, sit, stand and/or walk with normal breaks for about six hours in an eight-hour workday, and had unlimited ability to push and/or pull (other than as shown for lifting and/or carrying).  The doctor further concluded that claimant could occasionally climb, stoop, kneel, crouch, or crawl, and frequently balance, and had no manipulative, visual, communicative, or environmental limitations.  The doctor cited evidence in the record supporting this evaluation.  (Tr. 321-28).

Rivera received a series of spinal "blocks" from a pain clinic between May and August 2005.  (Tr. 149-54, 157-58, 245-46).  After the first block, he reported that it helped for three weeks, but he still had lumbosacral pain radiating to the left leg and felt as if his hip were about to come loose.  The treating physician prescribed medication and recommended a cane.  (Tr. 161-62).  On October

4, 2005, Dr. Renier Méndez de-Guzmán referred claimant for surgery, opining that without surgery, Rivera's case would be chronic, with relapses requiring chronic support and treatment. (Tr. 159-60, 235-36). A month later, progress notes showed Rivera had severe lumbar pain, walked with difficulty and limited movements; and said he could not do his recommended exercises. He was given Norflex and Toradol injections. After evaluation, his case was deemed not one for surgery. (Tr. 129-31, 241-42). On December 20, 2005, after completing the spinal "blocks," claimant reported constant lumbar pain but did not complain about his ankle or shoulders. He was discharged from the SIF with 10% permanent partial disability for general physiological functions. (Tr. 145-46).

On March 8, 2006, Dr. Renato Sartori performed a neurological evaluation of claimant for the Social Security Administration's ("SSA") Disability Determination Program ("DDP"). Claimant was alert and cooperative but non-talkative; his wife did most of the talking for him. According to her, due to pain, Rivera was unable to do almost anything and could not stand, walk, or lie for long, and she had to help him get from bed to the living room. He walked with a cane, which Dr. Sartori deemed was not necessary at all times, did not use the walls or require someone's assistance for support, could raise a straight leg to thirty degrees, and had "questionably diminished" ankle reflexes. He claimed low back pain on passive leg flexion at hips and knees and when lying prone with sudden knee flexion, and would not bend at all, squat, or kneel. Dr. Sartori concluded there was no gross neurological deficit to establish a clear diagnosis of lumbosacral radiculopathy, otherwise his symptoms and history might be consistent with chronic lumbosacral syndrome. Dr. Sartori wrote that claimant tended to exaggerate his symptoms, somewhat obscuring the assessment. (Tr. 215-220). X-rays taken the same day were consistent with the x-rays taken on referral from Dr. Mubarak in June 2005. (Tr. 221).

## II.    Mental Treatment History

Rivera underwent psychiatric treatment with Dr. Ruth Rivera Malavé from September 4, 2003 through at least July 7, 2005. (Tr. 383-441). On his first visit, claimant reported that for six

months, he had experienced anger, poor sleep, varying appetite and weight, listlessness, irritability, depression, anxiety, tremors, and crying spells.  He was diagnosed with major depression, single episode, and prescribed Paxil and Ambien.  (Tr. 434-37).  Thereafter, Rivera saw Dr. Malavé every two weeks at first, decreasing to once per month after February 2004.  Notes from his appointments show that claimant consistently was alert and oriented in the three spheres, with intact immediate and recent memory, logical, coherent, relevant thought, decreased libido, and a depressed and frequently anxious mood.  He had appropriate appearance, psychomotor activity, behavior, attitude, speech, affect, and thought content, without delusions.  His medications were continually altered in both type and dosage, sometimes in response to side effects he reported or exhibited.  He reported auditory or visual hallucinations in October 2003, June 2004, February 2005, and March 2005.  (Tr. 247-48, 265-66, 356-57, 383-441, 458-59).

At the start of treatment with Dr. Malavé, claimant was fragile, vulnerable, depressed, anxious, fearful, and easily distracted.  Dr. Malavé referred him for outpatient treatment at Pan American Hospital from October 1 to 15, 2003 due to his marked depressive symptoms and poor impulse control.  After the outpatient treatment, he continued with mild anxiety symptoms, was cooperative and not delusional, and showed no evidence of perceptual disturbance.  (Tr. 426-33, 442-55).  Throughout November 2003, claimant still had severe symptoms; he reported engaging in little activity at home, was tired, went to bed early, and talked to himself occasionally.  In late November 2003, his irritability, anxiety, and anger increased; he went back to work.  In December 2003, he talked less to himself, and was counseled about staying on his medications.  (Tr. 420-25).

After reporting outbursts of anger, bad humor, and arguments at work and at home in early 2004, claimant reported improvement and feeling stable in late February 2004.  In March 2004, he reported arguments at home, not doing housework, and being intolerant with children.  In April 2004, he had erratic compliance with treatment, forgot an appointment, and had ups and downs.  In June 2004, he reported that he had poor impulse control, hit a coworker, and had the impulse to jump off a car.  Claimant reported in August 2004 that he had not worked in a month due to two herniated

discs.  He had poor impulse control and side effects from his medication.  In September 2004, he reported constant back pain and his medication made him irritable and verbally aggressive.  In November 2004, Rivera's condition was severe.  He feared driving and had tremors, crying spells, pains, sadness, and financial pressures.  (Tr. 396-419).  In December 2004, he reported frustration at his inability to work, increased anxiety and fear at night, thoughts of death, lack of motivation, crying, heart palpitations, and sleep difficulty due to severe pain.  (Tr. 185-86, 269-70, 360-61, 396-419, 475-76).  He stated that over the year, he had had such symptoms as sadness, crying easily, sleep disturbance, hopelessness, thoughts of death, and anhedonia.  (Tr. 183-84, 279-80, 471-74).  In January 2005, he improved slightly and felt calmer but still got furious at times.  (Tr. 394-95).

Dr. Malavé completed a mental status questionnaire for claimant's insurer, Triple-S, on January 24, 2005.  She reported that Rivera's main complaint was major depression whose symptoms were exacerbated after a severe back injury that kept him out of work.  She noted severe depressive symptoms including sadness, crying, hopelessness, passive death thoughts, auditory hallucinations, and verbal and physical aggressiveness.  She recommended another year of psychiatric treatment, opined that claimant could not lift weight and was unable to work, and stated that his return to work would depend on the improvement of his back and depression.  In a functional capacity evaluation, she rated claimant's impairments as "severe" in every category.  (Tr. 497-503).

In February 2005, claimant had multiple complaints of pain and experienced sadness, crying spells, and anxiety.  When treated at the SIF on February 23, 2005, claimant complained of hallucinations, so his medication was increased.  (Tr. 265-66).  In March 2005, Rivera reported to Dr. Malavé that severe pain affected his mood and that sometimes he was depressed but he controlled himself.  In April 2005, he told Dr. Malavé he was depressed, had no desire in life, and that SIF had not approved his disability.  He was undergoing health stressors compounded by his son's illness and still had depressive symptoms, but had had no episodes of aggressiveness in some time.  (Tr. 281-82, 388-95).  In a letter to claimant's counsel dated July 7, 2005, Dr. Malavé stated that since claimant's "occupational accident" in July 2004, his mental condition had worsened and

it had been very difficult to stabilize him due to the multiplication of his stressors, especially his health and financial problems.  Dr. Malavé opined that claimant was not able to return to his work or any other work at that time.  (Tr. 385-86).

On July 7, 2005, psychiatrist Dr. Indra Febles Gordián completed a psychiatric evaluation of claimant for the DDP.  She noted that his response to treatment had been poor and that he had been treated at Pan American Hospital for his mental condition.  She wrote that Rivera's activity consisted of waking irregularly and wandering around the house, leaving the house only when accompanied by his wife.  He did not help with household chores, his wife drove him and he did not drive, and he did nothing for enjoyment, did not attend church, required supervision to take care of his personal needs, and had variable behavior with his family, neighbors, friends, and strangers.  He had decreased ability to do simple tasks in a continuous form, poor tolerance to stress, and tended to turn disruptive when he decompensated.  (Tr. 317-19).  During the evaluation, for which he was accompanied by his wife, claimant showed mild psychomotor retardation, sat in a tense position, and walked supported by a cane.  He had an anxious, depressed mood, was oriented in the three spheres, had slow, logical, relevant, coherent thought, and had intact recent memory and patchy, impaired remote memory.  His attention span and concentration seemed impaired.  His intellectual capacity seemed average, but his capacity to judge his present reality and anticipate the consequences of his acts was partly compromised.  He was deemed competent to handle his funds.  (Id.).

On September 8, 2005, SIF notes show claimant continued having depressive symptoms, namely, sadness, isolation, and anhedonia.  (Tr. 247-48).  The following day, a non-treating psychiatrist completed a mental RFC assessment and psychiatric review technique form ("PRTF") for the SSA, which was affirmed on May 6, 2006.  (Tr. 214, 294, 298-316).  The assessment rated Rivera moderately limited in the ability to understand, remember, and carry out detailed instructions, to maintain attention and concentration for extended periods, and to respond appropriately to changes in the work setting, but otherwise concluded that no significant limitations existed on Rivera's RFC. The reviewing psychiatrist wrote that "[c]laimant can perform simple tasks" and

> can hear, understand, remember, process, analyze and carry out simple instructions
> in a timely fashion, without difficulties or impairments. Can perform simple tasks.
> Can complete a normal workday/workweek without undue interruptions. Has the
> capacity to interact appropriately and effectively with superiors and co-workers. Is
> coherent, relevant, logical and in good contact with reality. Alleged 'voices' are most
> likely illusions since there is no objective evidence of a psychotic process.

(Tr. 298-302). In the PRTF, which covered the medical evidence from the alleged onset date until

the date of the PRTF, the reviewing psychiatrist concluded that claimant suffered from an

"adjustment disorder/somatization disorder." He rated Rivera as having a mild degree of limitation

with maintaining concentration, persistence, or pace, but otherwise no functional limitations. He

summarized the medical evidence supporting these conclusions. (Tr. 303-15).

In October 2005 progress notes from the SIF, claimant reported feeling very bad. He had

slow, logical, coherent, relevant thought, a sad and anxious mood, and no perceptual disorders. He

was oriented in person and place and partially oriented in time. (Tr. 243-44). According to progress

notes from late December 2005, claimant was responding adequately to treatment after completing

a series of psychiatric appointments through the SIF. He had an anxious mood and appeared

extremely depressed but was logical and coherent. (Tr. 145-46, 239-40).

Dr. Arturo Miró Díaz completed a psychiatric medical evaluation of claimant on January 30,

2006. Dr. Miro reported that claimant experienced mood swings, sadness, crying spells, and anxiety.

He was afraid of the dark and had hallucinations and disordered sleeping and eating. He was alert

and approachable, oriented in the three spheres, with a sad affect, flat mood, and logical, relevant,

and coherent thought. He was diagnosed with severe recurrent major depressive disorder with

psychotic features, given a Global Assessment of Functioning ("GAF") score[3] of 55%, prescribed

Prozac, Klonopin, Restoril, Cogentin, and Novane, and referred to psychotherapy. (Tr. 207-10).

---

[3] "[T]he GAF rating system . . . is not raw medical data; rather, the system provides a way for a mental health professional to turn raw medical signs and symptoms into a general assessment, understandable by a lay person, of an individual's mental functioning." González-Rodríguez v. Barnhart, 111 Fed. Appx. 23, 25 (1st Cir. 2004) (per curiam) (unpublished) (citing Howard v. Comm'r of Soc. Sec., 276 F.3d 235, 241 (6th Cir. 2002)).

Progress notes from one week later show that claimant had improved a little, with the same GAF score; he slept fairly, heard noises and voices, and stated that he felt as if something were going to happen to his children. (Tr. 205-06). One month later, March 6, 2006, he remained depressed and anxious and still heard voices. (Tr. 203-04). On February 16, 2006, the SIF ruled his emotional condition not work-related and discharged him. (Tr. 147-48, 237-38).

The DDP referred Rivera to Dr. Madeline Santos Carlo for psychiatric evaluation on March 13, 2006. Rivera, who leaned on a cane when walking, reported insomnia, auditory hallucinations, anxiety, memory loss, and depression, a history of suicidal ideas, and having a herniated lumbar disc, muscle spasms, and hypertension. He spent most of the day in bed, watched TV, needed help to care for his personal needs, and did not drive, do housework, use the telephone, or go shopping, to church, or out on weekends. He had friendly relations with neighbors and family, did not receive visitors, preferred to be alone, and required supervision. He had poor self-esteem, got upset easily, and had low tolerance for frustration and diminished capacity to solve problems at home and away from home. (Tr. 222-31).

During the evaluation with Dr. Santos, claimant had diminished motor activity, poor eye contact, dysphoric mood, and adequate affect; his speech production was diminished and he had slow, logical, coherent, and relevant thought. He was oriented in person and place and partially oriented in time, and there was no evidence of perceptual disturbances or suicidal ideas. He performed poorly in evaluations of immediate and short-term memory, and he remained absentminded with poor concentration. He did poorly in the intellectual capacity evaluation but had adequate judgment, insight, and ability to associate. Dr. Santos diagnosed recurrent major depression, gave a GAF score of 40%, and concluded that Rivera could not manage his funds and that his physical and emotional disorders interfered with his functional capacity. (Tr. 222-31).

In a March 28, 2007 initial visit with psychiatrist Dr. Magaly Johnson, claimant, who had recently been divorced, reported feeling increasingly depressed for the last three weeks after sporadic depression since 2002. He was anxious and had decreased appetite, sleep, interest, and energy. He

reported a history of back pain, headaches, muscle spasm, and herniated disc, and said he was hospitalized for two weeks in 2003 due to severe depression. He was alert and oriented in the three spheres. Dr. Johnson prescribed Haldol and Prozac for a diagnosis of recurrent severe major depression with psychotic features. Follow-up notes from April 2007 show his depressive symptoms were improving with increases in his medication, and after the addition of Trazodone in May 2007, when he was feeling depressed due to health problems, his depressive symptoms improved in June and July 2007. (Tr. 199-202). As of September 2007, claimant was taking trazodone, haloperidol, fluoxetine, and diphenhydramine. (Tr. 121-22).

III.    **Procedural History**

Rivera applied for disability insurance benefits on February 23, 2005. His application was denied initially and upon reconsideration. (Tr. 11, 22-23, 29-40). Rivera requested a hearing, which was held before Administrative Law Judge ("ALJ") Gilberto Rodríguez on October 25, 2007. (Tr. 512-38). At the hearing, Rivera, who was represented by counsel, testified that after repeatedly lifting heavy objects, he got a herniated disc and started to feel pain on the alleged onset date. (Tr. 517). He testified that in his two years of treatment at the SIF, he never received nor was recommended surgery for his back condition, for which he received, he guessed, 20% disability upon discharge. (Tr. 518-20). Claimant testified that although he was never hospitalized as an inpatient for a mental or physical condition, he received three weeks of outpatient treatment on dates he could not remember for severe depression, during which he received pharmacotherapy and "[a] lot" of psychotherapy. He became upset while testifying that Dr. Malavé referred him for the outpatient treatment due to aggressiveness, such as trying to fight with his wife and family. (Tr. 519-23).

Rivera testified that he had intense pain in both shoulders that was worst in the morning and in humid or cold weather. He testified that he experienced pain in the lower back, left leg, and below the buttock, and felt a cramp when walking on that leg. He said that his back pain also caused constant pain in his left ankle and knee that made his ankle swell up. (Tr. 534-35). He testified that he took pain medications and went to the emergency room for intramuscular injections when the pain

became too severe. (Tr. 534). He further testified that he was doing poorly emotionally, was always depressed, cried, got irritable, felt like screaming, and was in a bad mood. He testified that he had very bad memory and concentration and slept poorly, although medication helped. (Tr. 535-36).

Claimant testified that he did nothing: he did no chores around the house because the pain and medications kept him in bed almost all day. He spent his time either lying down or sitting, watched TV, did not read or exercise, and did not go to church or engage in any social or family activities. He did not drive, occasionally accompanied his wife on shopping trips, and no longer went fishing or to the park with his step-children as he used to do. (Tr. 529-30, 533-34, 536-37).

Reviewing the evidence of record, the ALJ found that Rivera was not disabled. (Tr. 8-21). Rivera requested a review by the Appeals Council, which was denied. (Tr. 3-10). The ALJ issued his ruling on February 5, 2008. (Tr. 8-21). With regard to the five-step evaluation process, the ALJ found that Rivera had met his burden on steps one through four, but that under step five, Rivera had the residual functional capacity to perform medium work and thus was not disabled. (Tr. 14, 20). Specifically, the ALJ determined that: (1) Rivera did not engage in substantial gainful activity since the alleged onset date; (2) Rivera's back disorder and affective disorder were "severe"; (3) Rivera's combination of impairments did not meet or medically equal one of the listed impairments in Appendix 1 of the regulations; (4) Rivera was unable to perform his past relevant work; but (5) Rivera retained the residual functional capacity to perform medium work: he could lift/carry 50 pounds occasionally and 25 pounds frequently, could stand, walk, and sit for up to six hours in an eight-hour workday, could frequently balance, and could occasionally climb, stoop, kneel, crouch, and crawl. He had no manipulative, visual, communicative, or environmental limitations and was mentally able to understand, remember, and carry out routine, repetitive, simple or detailed instructions or tasks and to respond appropriately to supervision, coworkers, and usual work situations. Accordingly, the ALJ determined that Rivera was not disabled within the meaning of the Act from June 28, 2004 through the date of the decision. (Tr. 13-20).

In discussing the medical evidence of Rivera's RFC, the ALJ found that while Rivera's medically determinable impairments could have been reasonably expected to produce the alleged symptoms of his physical and mental impairments, his statements about the impairments' severity and the symptoms' intensity, persistence, and limiting effects were not entirely credible nor consistent with the preponderance of the evidence.  (Tr. 18, 19).  The ALJ noted that he closely observed claimant during the hearing and used those observations as one factor among many in evaluating claimant's credibility and RFC.  (Tr. 18).  The ALJ summarized the medical evidence in the record.  (Tr. 14-19).  He gave greater weight to the analyses by the SIF's experts because they were consistent with and supported by the preponderance of evidence in the record  (Tr. 18-19), but discounted Dr. Malavé's opinion evidence as unsupported and inconsistent with other evidence from treating physicians.  (Tr. 17, 19).

Considering the record as a whole, the ALJ concluded that Rivera was not disabled.  With respect to Rivera's back condition, the ALJ found that the evidence of record showed that Rivera had a long history of spasm, spondyloarthritic and discogenic disease, and left shoulder pain, that the spinal blocks provided no relief for his low back pain, but that acupuncture yielded good results and medications relieved his left shoulder pain.  The ALJ noted evidence that claimant used a cane, tended to exaggerate his symptoms, and did not always follow his recommended treatment, including physical therapy and prescribed exercises.  The ALJ noted that according to vocational experts who had reviewed the entire record, claimant had the physical RFC to do medium work.  (Tr. 15-16).

Regarding claimant's mental condition, the ALJ found that the medical evidence showed claimant suffered from major depression, was consistently logical, alert, relevant, and well-oriented, occasionally had hallucinations or did not follow prescribed treatment, had not required any mental hospitalization, and responded well to psychotherapy and pharmacotherapy treatment.  (Tr. 17-18).  The ALJ credited the SIF psychologists' and psychiatrists' evaluations of claimant's mental condition, which concluded that claimant's functional mental limitations were mild: moderately limited in only four of twenty categories and otherwise not significantly limited.  The ALJ noted that

the evaluations found no limitations on claimant's activities of daily living or social functioning and only mild limitations on maintaining concentration/persistence or pace, and that Rivera retained the ability to learn, understand, remember and carry out simple instructions and directions and to interact appropriately with coworkers and supervisors.  (Tr. 18-19).  The ALJ noted evidence that the claimant reported good relationships with family and neighbors, could handle his funds, and had no documented extended episodes of decompensation.  (Tr. 17-18).

The ALJ discredited Dr. Malavé's mental status questionnaire from January 24, 2005 (see Tr. 497-503) on the grounds that it did not have treatment notes attached and because no other treating physician's notes corroborated the symptoms claimant reported in the questionnaire of sadness, crying spells, death wishes, auditory hallucinations, verbal and physical aggressiveness, and ideas of hopelessness.  The ALJ stated that Dr. Malavé's conclusions were on issues reserved to the Commissioner to decide.  (Tr. 17, 19).  The ALJ did not mention Dr. Malavé's other records.

The ALJ found that considering claimant's age, education, work experience, and RFC, jobs exist in significant numbers in the national/regional economy that claimant can perform.  The ALJ agreed with and adopted "the assessment of the SIF's expert personnel, who determined that claimant is able to perform representative occupations . . . which are within his residual functional capacity" and "are unskilled jobs, simple, routine and repetitive," such as Getterer, Stem Mounter, and clock and watch hand mounter.[4]  The ALJ concluded that the Medical-Vocational Guidelines, 20 CFR Part 404, Subpart P, Appendix 2 ("Grid"), directed a finding of "not disabled."  (Tr. 20).

## DISCUSSION

The sole question in this case is whether substantial evidence supports the ALJ's determination at step five in the sequential evaluation process contained in 20 C.F.R. § 404.1520 that Rivera was able to perform work that existed in the national economy.

---

[4] While the ALJ cited to the evaluation's location in the record at exhibit E-4 (Tr. 20), the court could not locate that exhibit in the transcript, which starts at E-5.  (Tr. 116).  This omission appears to have baffled claimant's counsel as well.  (Tr. 506).

First, claimant argues that the ALJ improperly discounted plaintiff's testimony about his pain. (Docket No. 10, p. 13).   Where, as here (Tr. 19), it has been determined that a claimant has an impairment that could reasonably be expected to produce the symptoms alleged, an ALJ may not disregard a claimant's statements about the intensity and persistence of symptoms or about their effect on his ability to work solely because they are not substantiated by objective medical evidence. See 20 C.F.R. § 404.1529(c)(2).   Rather, the ALJ must consider the entire record and "must make specific findings as to the relevant evidence he considered in determining to disbelieve" the claimant. Da Rosa, 803 F.2d at 26 (citation omitted).   In addition to objective medical evidence, the ALJ must consider such factors as the claimant's daily activities, aggravating and precipitating factors, medications, treatments, or other alleviating non-medical treatments taken by the claimant, and any other factors concerning the claimant's limitations.   20 C.F.R. § 404.1529(c)(3).

The ALJ's credibility determination "is entitled to deference, especially when supported by specific findings," since the ALJ "observed the claimant, evaluated [his] demeanor, and considered how that testimony fit in with the rest of the evidence."   Frustaglia v. Sec'y of Health & Human Servs., 829 F.2d 192, 195 (1st Cir. 1987).   The ALJ need not credit testimony that is not supported by the medical evidence.   See id. at 194-95 (citations omitted).   It is the Commissioner's responsibility to determine issues of credibility, draw inferences from the record evidence; and resolve conflicts in the evidence.   Ortiz, 955 F.2d at 769 (citation omitted); Evangelista v. Sec'y of Health & Human Servs., 826 F.2d 136, 141 (1st Cir. 1987) (citations omitted).

Here, claimant testified at the hearing that he suffered constant pain in the shoulders, left ankle and knee, and lower back, and did nothing around the house because he was largely bedridden due to pain and medication.   The ALJ found that claimant's testimony was not entirely credible.   He explained that he took into account his own close observations of Rivera's demeanor, behavior, expression, body dynamics, entrance and exit from the hearing, as well as the fact that claimant's doctors had not required nor recommended hospitalization or another "highly supported" living environment.   The ALJ noted claimant's acupuncture therapy, use of a cane, treatment and

medication history including spinal blocks, test results, and examining physician's opinion evidence that he exaggerated his symptoms.  The ALJ gave greater weight to the medical experts' evaluations in the record, which he found consistent with the record evidence.  (Tr. 18, 19).

The ALJ's decision shows he properly supported his credibility determination by reference to record evidence of claimant's medications, spinal blocks, alleviating treatments such as acupuncture and a cane, aggravating factors such as claimant's uneven compliance with physical therapy, the lack of hospitalization or surgery, claimant's self-reporting over the course of his treatment, and the ALJ's own observations of claimant.  See 20 C.F.R. § 404.1529(c)(3).  Moreover, it is clear that the ALJ considered claimant's daily living activities as the decision cites evidence, such as Dr. Sartori's evaluation, that references claimant's daily living activities.  (Tr. 16).

Although the record contains evidence more favorable to claimant, see Evangelista, 826 F.2d at 141, particularly with respect to claimant's daily living activities, the record supports the ALJ's credibility decision regarding Rivera's allegations of pain.  The record shows that claimant never received pain treatment more aggressive than medication, acupuncture, and physical therapy, and that his case was deemed not appropriate for surgery shortly after Dr. Méndez recommended surgery – a conflict it was for the ALJ to resolve.  Ortiz, 955 F.2d at 769 (citation omitted).  The record further shows that claimant was considered to exaggerate his symptoms and that he did not complain of shoulder or ankle pain after receiving the "blocks."  Together with the ALJ's observations of claimant, there is substantial record evidence to back up the ALJ's treatment of Rivera's testimony.

Next, claimant contends that substantial evidence does not support the ALJ's finding that claimant could perform medium work.  The ALJ found that Rivera "has the residual functional capacity to perform medium work," namely, that he could lift/carry 50 pounds occasionally and 25 pounds frequently, could stand, walk, and sit (with normal breaks) for up to six hours in an eight-hour workday, could frequently balance, and could occasionally climb, stoop, kneel, crouch, and crawl.  (Tr. 14-15).  Claimant contends that the medical evidence shows he is unable to stand or sit for extended periods of time, contrary to the ALJ's finding.  (Docket No. 10, p. 14-15).

The ALJ's RFC finding mirrors the physical RFC assessment in the record, which was based on a review of the medical evidence and was reaffirmed twice over the following ten months. (Tr. 14-15, 17, 213, 295, 320-28). While non-treating physicians' RFC assessments "are not substantial evidence, these may serve as supplementary evidence for the ALJ to consider in conjunction with the examining physicians' reports." Irizarry, 253 F. Supp. 2d at 219. The RFC assessment cited the evidence on which it was based (Tr. 322), and the ALJ found the assessment consistent with the record. (Tr. 17, 18-19). The ALJ also cited Dr. Sartori's evaluation from March 2006, which noted that claimant did not need assistance for support, could walk on tandem and heels and toes "acceptably well," and did not need his cane at all times or in all terrain. (Tr. 16, 215-18). Although SIF progress notes from November 2005 stated claimant "walks with difficulty" (Tr. 130), the ALJ permissibly resolved this conflict (if it is one, given the four-month interim) in favor of Dr. Sartori's report for the DDP. Ortiz, 955 F.2d at 769 (citation omitted); Lizotte v. Sec'y of Health & Human Servs., 654 F.2d 127, 130 (1st Cir. 1981) ("it is within the [Commissioner's] province to accord greater weight to the report of a medical expert" he commissioned) (citation omitted).

The RFC assessment, the medical records on which the assessment was based, and subsequent medical records thus provide evidentiary support for the ALJ's findings regarding claimant's ability to sit, stand, and walk. By contrast, the only evidence of the extreme degree of limitation claimant alleges in sitting, standing, and walking consists of claimant's own allegations (properly discounted by the ALJ) and those of his wife, which are not "objective medical evidence of record" as claimant characterizes them. (Docket No. 10, p. 15). Claimant's wife told Dr. Sartori that claimant could not stand, walk, or lie for long and needed assistance in going from bed to the dining room. (Tr. 215). Her statements do not rise to the level of lay witness testimony, which an ALJ must consider. 20 C.F.R. § 404.1513(d)(4); Page v. Astrue, 2009 WL 700148, at *4 (D.N.H. Mar. 16, 2009). The ALJ thus permissibly left the spouse's statements, which were inconsistent with Dr. Sartori's own contemporaneous observations of claimant, out of his summary of Dr. Sartori's evaluation. (Tr. 16). Moreover, the spouse's statements mirrored claimant's own discounted

testimony from the hearing, where, as noted, the ALJ closely observed Rivera. Accordingly, I find that notwithstanding claimant's and his spouse's allegations, substantial evidence supports the ALJ's RFC finding that claimant could sit, stand, and walk up to six hours in an eight-hour workday.

Next, claimant argues that the ALJ erred by not taking testimony from a vocational expert ("VE") about claimant's physical limitation. (Docket No. 10, p. 15-16). The ALJ concluded that the Grid directed a finding that the claimant was not disabled. (Tr. 20). The Grid is "predicated on an individual's having an impairment which manifests itself by limitations in meeting the *strength* requirements of jobs." 20 C.F.R. Part 404, subpt. P, App. 2, § 200.00(e) (1988) (emphasis added). Thus where a claimant has one or more non-strength limitations that significantly affect his ability to perform the full range of jobs he is otherwise exertionally capable of doing, exclusive reliance on the Grid is inappropriate and the Commissioner must carry his burden by other means, typically through the use of a vocational expert. Ortiz, 890 F.2d at 524 (citations omitted). "If a non-strength impairment, even though considered significant, has the effect only of reducing that occupational base marginally, the Grid . . . can be relied on exclusively," but the need for vocational evidence increases with the degree of erosion of the occupational base. Id. at 524-25 (citations omitted).

The ALJ concluded that claimant had the RFC to stoop, kneel, crawl, and crouch occasionally (as opposed to frequently) , but could do "a full or wide range of medium work." (Tr. 14, 20). However, as claimant points out (Docket No. 10, p. 14), "to perform the full range of medium work as defined,[5] a person must be able to do both *frequent* stooping and *frequent* crouching," so "any limitation of these functional abilities must be considered very carefully to determine its impact on the size of the remaining occupational base of a person who is otherwise found capable of medium work." SSR 83-14, 1983 WL 31254 (1983) (emphasis added). The ALJ's decision does not address how claimant's stooping and crouching restrictions affect the occupational

---

[5] "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, we determine that he or she can also do sedentary and light work." 20 C.F.R. § 404.1567(c).

base.  The court thus agrees with claimant that the ALJ was not justified in finding that Rivera could do a full range of medium work despite these nonexertional physical restrictions.  Accordingly, the ALJ was not entitled to rely solely on the Grid and was required to use a vocational expert.

In his decision, the ALJ adopted an assessment by vocational expert personnel, who ostensibly determined, "based on the evidence of record, . . . that there are jobs that the claimant can perform, consistent with the claimant's residual functional capacity [the ALJ] found."  (Tr. 20).  In an unusual wrinkle, that assessment is missing from the record.  It is therefore not clear precisely what the assessment stated or what it considered.  Courts have often found error in an ALJ's reliance on a VE's responses to written interrogatories, whether due to inaccuracy or incompleteness of the ALJ's hypotheticals or the VE's written replies, e.g., Banks v. Massanari, 258 F.3d 820, 831-32 (8th Cir. 2001); Hardy v. Apfel, 198 F.3d 240, at *1 (5th Cir. 1999) (unpublished); Volak v. Chater, 64 F.3d 670, at *3 (10th Cir. 1995) (unpublished); Terry v. Sullivan, 903 F.2d 1273, 1279 (9th Cir. 1990); Brenner v. Schweiker, 711 F.2d 96, 99 (8th Cir. 1983), or concerns about due process and the claimant's inability to cross-examine the VE.  See generally Passmore v. Astrue, 533 F.3d 658, 661-65 (8th Cir. 2008).  In addition, claimant's request for review (Tr. 506) seems to suggest that claimant was left out of the process whereby the ALJ elicited the putative VE's assessment.  Accordingly, whatever the contents or merits of the missing assessment, I think the wisest course is to remand to the ALJ for the taking of *live* vocational expert testimony about the impact on the occupational base of medium work of claimant's non-exertional physical limitations.

Finally, claimant argues that with regard to his mental condition, the ALJ erred by disregarding evidence favorable to claimant and by interpreting raw medical data himself in lieu of taking testimony from a VE and/or a medical expert ("ME").  (Docket No. 10, p. 16-18).  An ALJ's exclusive reliance upon the Grid is appropriate so long as the claimant's mental impairment does not "interfere more than marginally with the performance of the full range of unskilled work."  Ortiz, 890 F.2d at 526.  In evaluating a mental impairment, the ALJ's decision must include a specific finding as to the degree of limitation in each of four functional areas: activities of daily living; social

functioning; concentration, persistence, or pace; and episodes of decompensation.  20 C.F.R. §

404.1520a.  A mental impairment may be considered "not severe" when the Commissioner rates the

claimant's degree of limitation in the first three functional areas as "none" or "mild" and "none" in

the fourth area.  20 C.F.R. § 404.1520a(d)(1); see also Figueroa-Rodríguez v. Sec'y of Health &

Human Servs., 845 F.2d 370, 372 (1st Cir. 1988).

        Here, the ALJ concluded that claimant had the mental RFC to "understand, remember and

carry out routine, repetitive, simple/detailed instructions/tasks" and to respond appropriately to

supervisors, coworkers, and usual work situations.  (Tr. 15).  There is no evidence that the ALJ

interpreted raw medical data to reach this conclusion; rather, his RFC finding largely tracks the non-

treating psychiatrist's mental RFC assessment, which concluded that claimant had no significant

mental limitations except for moderate limitations in the ability to understand, remember, and carry

out detailed instructions, maintain attention and concentration for extended periods, and respond

appropriately to changes in work setting. (Tr. 18, 298-316).  The ALJ adopted the RFC assessment's

conclusions that claimant had no episodes of decompensation, no limitation on daily living activities

or social functioning, and mildly limited concentration, persistence, and pace.  (Tr. 18).

        In addition to the RFC assessment and PRTF, the ALJ also considered treatment notes from

SIF physicians and Dr. Johnson, Dr. Santos's evaluation, and his own observations of claimant at

the hearing.  (Tr. 17-18).  The medical records cited by the ALJ provide substantial evidence for his

mental RFC finding.  The ALJ accurately summarized that evidence to characterize claimant as

consistently alert and oriented, responsive to psychotherapy and pharmacotherapy without (inpatient)

hospitalization, and having logical, relevant, coherent thought.  (Tr. 17).  Claimant's argument that

the ALJ improperly ignored evidence favorable to claimant is unavailing, since the ALJ considered

multiple complaints of hallucinations (Tr. 17) and his own observations at the hearing, during which

claimant became agitated and had to be calmed by his counsel and the ALJ.  (Tr. 18, 523).

        Furthermore, the ALJ did not err in discounting Dr. Malavé's mental RFC assessment as

inconsistent with other evidence.  (Tr. 19, 497-503).  The ALJ correctly noted that he bears the

responsibility for assessing a claimant's RFC, and he permissibly resolved conflicts in the evidence and afforded greater weight to the Commissioner's own medical experts' reports.  20 C.F.R. § 404.1546(c); Ortiz, 955 F.2d at 769 (citation omitted); Lizotte, 654 F.2d at 130 (citation omitted). Curiously, however, the ALJ also discredited Dr. Malavé's report because "treatment notes were not attached to her report," even though the record contains copious treatment notes from Dr. Malavé. (Tr. 17, 19, 383-441).  It therefore appears that the ALJ did not consider Dr. Malavé's treatment notes.  However, the non-treating physician's RFC assessment, which the ALJ relied on, *did* take into account Dr. Malavé's records from start of treatment through March 22, 2005 (close to the end of treatment).  (Tr. 315).  Dr. Malavé's records, like the substantial evidence that already supports the ALJ's decision, consistently show claimant to be alert, oriented, logical, and coherent, and the ALJ on remand could properly resolve any inconsistencies between Dr. Malavé's notes and other treating physicians' records.  Remand to consider Dr. Malavé's records would thus be pointless.

Since substantial evidence by treating doctors, taken together with the non-treating physician's RFC assessment and PRTF, support the ALJ's mental RFC finding, no medical expert testimony was required.  See Rivera-Torres v. Sec'y of Health & Human Servs., 837 F.2d 4, 7 (1st Cir. 1988) (citing Berrios, 796 F.2d at 576).  Moreover, because substantial evidence supports the ALJ's finding that claimant's mental impairment was not severe, the ALJ properly relied on the Grid without taking VE testimony.  Ortiz, 890 F.2d at 526; Figueroa-Rodríguez, 845 F.2d at 372.

## CONCLUSION

For the reasons stated above, I recommend that the Commissioner's decision be **VACATED** and .remanded to the ALJ for the taking of live testimony from a vocational regarding the impact of claimant's non-exertional physical limitations on the occupational base for medium work.

This report and recommendation is filed pursuant to 28 U.S.C. 636(b)(1)(B) and Rule 72(d) of the Local Rules of this Court. Any objections to the same must be specific and must be filed with the Clerk of Court within fourteen (14) days of its receipt.  Failure to file timely and specific objections to the report and recommendation is a waiver of the right to appellate review.  See

**Rivera Ramos v. Commissioner of Social Security**                                    Page 24
CIVIL NO. 10-1220 (JAG/BJM)
**REPORT AND RECOMMENDATION**

Thomas v. Arn, 474 U.S. 140, 155 (1985); Davet v. Maccorone, 973 F.2d 22, 30-31 (1st Cir. 1992);

Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co., 840 F.2d 985 (1st Cir. 1988); Borden v.

Sec'y of Health & Human Servs., 836 F.2d 4, 6 (1st Cir. 1987).

      **IT IS SO RECOMMENDED**.

      At San Juan, Puerto Rico, on this 7th day of March, 2011.


                              *S/Bruce J. McGiverin*
                              BRUCE J. McGIVERIN
                              United States Magistrate Judge